THOMPSON v. BOARD OF SUPR'S OF LEE COUNTY. See Case No. 15,589.

THOMPSON (BRITISH CONSUL v.). See Case No. 1,899.

## Case No. 13,944.

### THOMPSON v. BUSCH.

[4 Wash. C. C. 338.] [2]

Circuit Court, E. D. Pennsylvania. Oct. Term, 1822.

SEAMEN—JUSTIFICATION FOR DISCHARGE OF MATE—WAGES—DUTIES OF OFFICERS AND SEAMEN—FORFEITURE.

1. If the mate act so improperly as to justify the master in degrading and dismissing him from

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richards Peters, Jr., Esq.]

his office, he is not entitled to his wages. But if he be improperly dismissed, he is entitled to them; and is not bound to perform the duties of a common seaman.

2. What are the relative duties of the inferior officers and seamen to the master, and of him to them.

[Cited in Fuller v. Colby, Case No. 5,149.]

3. The mate may forfeit his right to command and his wages, by fraudulent, unfaithful, and illegal practices, by gross and repeated negligence, or flagrant, wilful, and unjustifiable disobedience; by incapacity, induced by his own fault, or palpable want of skill in his profession; but the causes of removal should be evident, strong, and legally important.

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.]

In admiralty.

WASHINGTON, Circuit Justice. This is an appeal from a sentence of the district court upon a libel of the appellee, the mate of the ship Benjamin Rush, for wages. The objection made by the owner of the vessel to the sentence of the court below is, that the mate was, for a justifiable cause, dismissed from his office at Calcutta by the master, and that he performed no duty on the return voyage to Philadelphia.

The evidence in the cause establishes the following facts: That the mate was sober in his habits; was well acquainted with the duties of his station on board; and upon all occasions performed them faithfully during the outward voyage from Philadelphia to Calcutta. No one instance of disobedience to the orders of the captain is proved, or even alleged. The captain frequently disagreed with his officers during the voyage, and was in the habit of using very harsh and abusive language towards them, in the presence of the crew. It is stated by one witness, that he has heard the mate give disrespectful answers to the captain, which probably happened at those times when his temper was ruffled by what he may have considered as ill treatment; but it does not appear that, upon any one of these occasions of disagreement between these two officers, any thing was said by the mate which called for, or was followed by, the infliction of the slightest punishment. It is however in full proof that the mate frequently spoke of the captain, out of his presence, but within hearing of the crew, in very disrespectful terms, applying to him many gross and vulgar epithets. On one occasion he went so far as to propose to the carpenter and sailmaker to go aft and flog the captain. Frequently, when the men would complain to him of being overworked, or otherwise ill treated, he would desire them to go and speak to the captain, who was the proper person to grant redress; and upon similar occasions he would advise them to speak for their rights to the captain, and would abuse them for not doing so. The vessel having suffered considerably in a gale, to which she was exposed soon after she left

the capes of Delaware, the mate ventured, in the presence of some of the crew, to censure the captain for not putting into the Brazils to refit, giving it as his opinion that it was a rash undertaking to proceed upon the voyage without having done so. Soon after the arrival of the ship at Calcutta, Spinney, one of the crew, against whom the mate had complained to the captain on account of some alleged misconduct, gave some information to the captain respecting the mate, which led to the measure of collecting all the crew upon the quarter deck, for the purpose, it would seem, of an inquiry into the conduct of that officer during the voyage. The mariner who had given this information, then stated, that if the crew had followed the directions of the mate, the ship would not have arrived; as he had endeavoured, by some undermining way, to create disturbance on board, and to establish insubordination; that when the men would speak to him of their ill usage, he would abuse them for not going aft and speaking for their rights. The carpenter next spoke, and observed that, upon one occasion, the mate asked him if the captain was not an old rascal, and added something about shooting, to which the carpenter replied, that the captain was as good a shot as he, the mate, was; that nothing further was said on the subject. Another of the crew came forward, and declared that he had never heard any thing said of a meeting, or of insubordination on board the vessel; but that he had frequently heard the mate speak desrespectfully of the captain, and in answer to the complaints of the crew, would tell them to go to the captain, who was the proper person to afford them redress. The captain then asked the rest of the crew if they knew any thing of the matter, and was answered by each of them that he knew nothing of meetings or of insubordination, but had often heard the mate speak in disrespectful terms of the captain. Immediately upon receiving these answers, the captain informed the mate that he was removed from his office, which was followed by appointing the second mate to succeed him. This order of dismission was never afterwards revoked. On the home passage, the mate made no offer to do work on board, nor was he required by the captain to do any.

These are all the facts in the case which I consider to be at all material; and the question is, whether they warranted the dismission of the mate from his office? If they did, they subject him to a forfeiture of his wages, since, by his own misconduct, he incapacitated himself to comply with his contract to perform the duties of a mate during the whole voyage out and in. If, on the other hand, he was improperly dismissed, the law considers the prevention from performing these duties, in consequence of his dismission, a sufficient excuse for his non-performance, and he was not bound to act in the capacity of a common mariner, even if the captain had required of him to do so. What were the precise reasons which influenced the captain to dismiss this officer at Calcutta, can only be conjectured, since he did not think it necessary to assign any at that time. We may nevertheless conclude that his removal was caused by the communications made by the three seamen upon the quarter deck; and the inquiry will be, whether the facts related by those men justified the measure which was then adopted, and was afterwards persevered in. It is not to be doubted but that the master is entitled to, and has a right to exact from his officers and crew, not only a strict observance of all his lawful orders in matters relating to the navigation of the ship, and the preservation of good order on board, but also to a respectful demeanour towards himself. In cases of disobedience of such orders, or of violations of the rules of decorum, which are, in a great degree, essential to the good government and discipline of the ship, the master has authority to correct the offender by moderate chastisement, temporary confinement, or reasonable privations of his ordinary comforts and privileges. But the design of such punishments being to produce reformation in the offender, and to deter others of his comrades from committing similar offences; they ought to cease as soon as the offences are atoned for by repentance, and an offer of the offender to return to his duty. If these be some of the duties of the inferior officers and crew towards their commander, he is, on his part, bound to observe towards them a temperate conduct, and not to provoke them by abusive language, or unnecessary mortifications, to treat him with disrespect. And although the misconduct of the master in these particulars will not justify disobedience, or even insolence on the part of the crew; it will, nevertheless, be entitled to great consideration when the nature and degree of the punishment inflicted on the offending mariner become the subject of judicial inquiry. There is a great want of precision in most of the foreign ordinances and sea laws, in defining those acts of a mariner which will subject him to a forfeiture of wages. By some of them, the master is authorised to turn away any thieving, quarrelsome, or factious mariner; but it is added, that in relation to the two latter offences, the master should have a little patience, to see if the offender can be brought to reason. By others, it would seem, as if contemptuous conduct, or other ill behaviour to the master, disorderly and riotous proceedings amongst the crew, or unfaithful conduct, will warrant the master in turning away the offender, and depriving him of his wages. But the degree to which these offences must advance in order to amount to such a breach of the contract on the part of the mariner, as to be visited by a forfeiture of wages, is no where defined by those laws, so as to become rules of decision in

the numerous cases which every day occur on board of merchant vessels. After an attentive examination of this subject, with a view to arrive at the real spirit and policy of these marine regulations, I accede without hesitation to the rules laid down by the learned judge of this district in the case of Atkyns v. Burrows [Case No. 618], which was the case of a mate, who had been dismissed for alleged misconduct, in which it was said, that "that officer may forfeit his right to command and wages by fraudulent, unfaithful, and illegal practices, by gross and repeated negligence, or flagrant, wilful and unjustifiable disobedience, by incapacity brought upon him by his own fault, or palpable want of skill in his profession; but the causes of removal should be evident, strong, and legally important."

I notice the disrespectful language in which Busch was in the habit of speaking to his comrades of the captain, merely for the purpose of condemning it. Had it been used in the presence and hearing of the captain, he would justly have subjected himself to punishment. How far the infliction of any punishment for such misconduct, long after it had been committed, and when no ill consequences either to the master or to the service had been produced by it, is to be justified, need not be decided in this case, since nothing can be more clear, than that it did not warrant his dismission and loss of wages. Since no charge was even alleged against this officer by the persons who gave evidence upon his examination of fraud, unfaithfulness, negligence, incapacity, or disobedience of orders, I am forced to conclude that the cause of his dismission was illegal practices tending to introduce insubordination and mutiny on board of the ship. And how was this charge supported? The opinion of Spinney, and the conclusions which he undertook to draw from the general conduct of the mate, or from particular facts, ought not, upon the most common principles of justice and of fair inquiry, to have resulted in his condemnation. I totally disregard therefore the declarations of that seaman, even if he appeared in the character of an unprejudiced witness, "that if the crew had followed the directions of the mate, the ship would not have arrived; and that he had endeavoured by some undermining way to create disturbance on board, and to establish insubordination." Did he arrive at that conclusion from the fact, and the only one which he stated, that in answer to the complaints of the crew of ill usage, he abused them for not going to the captain and speaking for their rights? If he did, I can only say that the conclusion, in my mind, was irrational, and unwarranted by the fact. If the object of the mate was to subvert the authority of the master, by introducing amongst the crew a general spirit of disaffection and insubordination, for the purpose of rendering himself popular with them, or for that of frustrating the voyage, would he have set an example, by his own conduct, of the strictest obedience to the orders of the captain upon all occasions? And would he have lost the opportunity, which the complaints of the crew on account of their ill treatment presented, of fostering their discontents, and of inducing them to look rather to himself for redress, than to the master, to whom, upon all such occasions, he uniformly referred them? I know of no way in which he could more effectually affirm the authority of that officer, and lead the crew to recognize and respect it, than by always presenting him to their view as their sole chief, and alone clothed with the power to redress their grievances. The proposition which he made to two of the men to flog the captain, as stated by them in their depositions, or of shooting, as mentioned by one of them on the quarter deck examination at Calcutta; may possibly have been caused by some provocation, real or imaginary, which the harsh conduct of the captain to his officers may have excited. However this may be, his conduct upon the occasion was unjustifiable; and had the suggestion been followed up by any overt act, I will not say that he would not legally have exposed himself to the penalty of dismission. But surely, I do not exercise more charity than the circumstances attending that transaction warrant, when I conclude, that either the proposition was not seriously made, or that it was immediately after repented of; for the carpenter accompanied his testimony by the declaration, that nothing more was said upon the occasion, and in his deposition, he swears that the subject was never afterwards renewed.

The expression by the mate, of his opinion that the ship ought to have put into the Brazils to refit, was, to say the most of it, a venial offence, and I pass it over with the single observation, that, as it was not made a charge against him by any of the crew, it could have had no influence in causing the sentence of dismission at Calcutta.

In reviewing the whole of this man's conduct, I see much to approve and to condemn. In many respects we find him acting the part of a useful officer, sober in his habits, obedient to orders, skilful and laborious in all the duties of his station. But he wanted the dignity of character which would have pointed out to him the impropriety of making the crew the confidants of his discontents and ill humor. Soured by the abusive language of the master, to which, in common with the other officers and the men, he was too frequently exposed, he spoke to them of that officer in language which degraded himself; and was calculated, though probably not intended, to excite dissatisfaction amongst them. But that he seriously meditated, at any time, a criminal opposition to the authority of the captain, or that he sought to encourage in the crew a disposition tending to such a result, cannot, in my opinion, be fairly inferred

from the evidence in the cause. On the contrary, it is deposed by all the crew who have been examined on oath, that they never heard an intimation from the mate which savoured of insubordination, or which was calculated to encourage secret meetings of any kind. As to depriving the master of his command, Dexter, one of the men who gave evidence against the mate at Calcutta, swears that he never heard such a word; and his evidence is, in this respect, confirmed by the testimony of two others of the crew. I acknowledge that I was, for a time during the argument, very unfavourably impressed against the mate, under the idea that, by his silence on the above examination at Calcutta, he impliedly admitted the truth of the general charge made by Spinney, of insidious endeavours to excite disaffection in the crew. Had this charge been proved, or admitted by the accused, expressly or by implication, I should have considered him very unfit to retain his command on board of the ship. But the irregularity, not to say unfairness, which marked all the proceedings of that extraordinary examination, relieves the mate from the imputation of an implied admission of such a charge. Sentence followed the examination of those who were called upon to testify against him, without affording him the opportunity to confess or to deny what was alleged against him, or to examine witnesses in his defence. This opportunity however awaited him on the return of the ship to this port, where he was acquitted, and I think rightly, of the charge of endeavouring to make a revolt, by a jury of his fellow citizens. Upon the whole, I am of opinion that there is no error in the sentence of the district court, and I therefore affirm it with costs. Affirmed.